(161 P.3d 807)
No. 94,837

STATE OF KANSAS, *Appellee,* v. CONQUAL D. LEWIS, *Appellant.*

 Opinion
filed July 13, 2007. 

*Christopher L. Hughes,* of Roger L. Falk & Associates, P.A., of Wichita, for appellant.

*Kristi Barton* and *Jeffrey E. Evans,* assistant district attorneys, *Nola Tedesco Foulston,* district attorney, and *Phill Kline,* attorney general, for appellee.

Before RULON, C.J., GREENE, J., and KNUDSON, S.J.

RULON, C.J.: Defendant Conqual D. Lewis appeals his convictions for voluntary manslaughter and criminal possession of a firearm, arguing the venire panel was unconstitutionally comprised, the State improperly exercised one of its peremptory challenges, and the district court abused its discretion in denying the defendant's motion for a downward sentencing departure. We affirm in part and dismiss in part.

The parties are aware of the underlying facts of the case, and we will limit our discussion of the facts to those necessary to address the legal issues raised in this appeal.

## MOTION TO DISCHARGE JURY PANEL

The defendant's primary contention on appeal involves the district court's denial of his motion to discharge the jury panel based upon a perceived systematic discrimination in Sedgwick County's jury selection procedure. In challenging the implemented procedure, the defendant admits that Sedgwick County employs a random, race-neutral procedure for obtaining a pool of prospective jurors. However, the defendant contends that Sedgwick County does not enforce jury service, which results in a disparity in the representation of African-Americans on juries.

Both parties claim the applicable standard of review is de novo because the issue involves statutory interpretation. Although re-

search revealed no Kansas cases citing the applicable standard for reviewing a district court's denial of a motion to discharge a jury, K.S.A. 22-3407 imposes an affirmative duty upon the party seeking discharge of the jury to prove the jury selection was improper. The district court's ruling on a motion to discharge a jury, therefore, involves mixed findings of fact and conclusions of law.

Generally, this court will affirm and adopt a district court's factual findings so long as the findings are supported by substantial competent evidence within the record. In reviewing the factual findings, an appellate court does not weigh conflicting evidence or evaluate the credibility of witnesses. See *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 836-37, 127 P.3d 292 (2006) (stating general scope of appellate review of district court's findings of fact); *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006) (discussing standard of review for admission of eyewitness identification). Nevertheless, the ultimate legal conclusion to be drawn from the factual findings is subject to unlimited appellate review. See *Corbett*, 281 Kan. at 304; *cf. United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998) (noting that review of a challenge to fair cross-section representation within the jury is a mixed question of fact and law but indicating an appellate court has de novo review).

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 99 S. Ct. 664 (1979).

### Exclusion of a Distinct Group

At trial, the defendant filed a motion to discharge the jury panel, alleging that African-Americans are underrepresented in Sedgwick County jury pools due to systematic discrimination. During the hearing on the motion to discharge the jury, the defendant submitted population data from the 2000 United States census. For statistical purposes, the defendant compared two tracts from Sedgwick County. One tract (Tract 1) had a total population of

13,271, 80% of which were African-American. The other tract (Tract 2) had a total population of 15,073, 90% of which were Caucasian. For purposes of the hearing, the district court accepted the defendant's statistics that 8,707 African-Americans in Tract 1 were at least 18 years of age and that 11,421 Caucasians in Tract 2 were at least 18 years of age.

The defendant further presented data based upon Sedgwick County District Court records that indicated the number of jurors summoned from Tract 1 on November 15, November 29, December 6, and December 13 was 51 and the number from Tract 2 on the same dates was 67. The total number of summoned jurors from the two tracts was 118. Forty-three percent of the summoned jurors were from Tract 1; 57% were from Tract 2. There was no available data to suggest how many of the summoned jurors from each tract were actually African-American or Caucasian. Of the 118 summoned individuals from the two tracts, only 12 of the summoned jurors from Tract 1 reported for jury duty during the 4 weeks under consideration, whereas 24 of the summoned jurors from Tract 2 reported for jury duty.

The defendant's discrimination argument is premised upon an assumption that the members of Tract 1 constitute a distinctive group of African-Americans within Sedgwick County. However, membership in Tract 1 does not necessarily infer a racial classification of African-American. While the individuals in Tract 1 were predominantly African-American, a significant portion (20%) of Tract 1 was classified in a different racial category. With respect to the jury pool data, there is no information regarding the number of African-Americans summoned on the specifically considered dates who failed to report for jury service. Therefore, the defendant's data reliably establishes only that members of Tract 1 may be less likely to honor their jury summons than members of Tract 2.

Dr. James Sheffield, a professor of political science, testified that Tract 1, as a group, represented substantially lower income households than Tract 2. Sheffield opined that lower income made jury service more burdensome and the members of Tract 1 were less likely to report for jury service without being compelled. K.S.A. 43-156 prohibits the exclusion of individuals from jury service on

the basis of socioeconomic status as well as on the basis of race. Nevertheless, the defendant failed to present any comparison information to demonstrate the actual income figures of the summoned individuals who reported for jury service against those who failed to report.

Consequently, the defendant's data fails to establish a distinctive class within the community subject to exclusion on jury panels in Sedgwick County. As a matter of logic, an individual's inclusion within Tract 1 does not establish his or her race or economic status. Consequently, geographical location within Sedgwick County arguably is the only determinative factor between the members of Tracts 1 and 2 who were summoned for jury duty on November 15, November 29, December 6, and December 13.

### Underrepresentation

However, assuming that membership within a predominantly minority, lower-income population census tract would constitute a distinct group within the community at large, the defendant must additionally demonstrate the representation of the distinct group within jury pools is not fairly or reasonably commensurate with the group's representation in the community. *Allen,* 160 F.3d at 1103. The defendant does not challenge the representation of Tract 1 within the lists of individuals summoned for jury service but argues that a disparity exists in the representation of jury panels actually assembled.

In *Swain v. Alabama,* 380 U.S. 202, 208-09, 13 L. Ed. 2d 759, 85 S. Ct. 824, *reh. denied* 381 U.S. 921 (1965), *overruled in part Batson v. Kentucky,* 476 U.S. 79 (1986), the United States Supreme Court stated:

"Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group . . . . We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%."

Based on an analysis of the data presented by the defendant, 43% (51 out of 118) of the summoned individuals from Tracts 1 and 2 were from Tract 1. Of the total number of summoned in-

dividuals from the two tracts who reported for service, 33% (12 out of 36) were from Tract 1. Therefore, the representation of Tract 1 in the pool from which the jury was ultimately selected was 10% less than the representation of Tract 1 in the pool of randomly summoned jurors. According to *Swain*, this disparity does not establish purposeful discrimination.

### Systematic Exclusion

Finally, the defendant is unable to establish that any disparity in the venire is caused by a system of discrimination. A party is not entitled to a jury panel that mirrors the community at large or closely reflects the various distinctive groups within the population. *Taylor v. Louisiana*, 419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975). Therefore, in order to prove systematic exclusion, the moving party must establish the exclusion is inherent in the jury selection procedure employed by the court. See *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir. 1995).

In *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992), our Supreme Court considered whether use of voter registration records to create jury pools constituted systematic discrimination because minorities were less likely to register to vote than Caucasians. Recognizing that the State imposed no bar to minorities' ability to register to vote, the *Bailey* court rejected the defendant's claim of discrimination. "The use of voter registration lists for jury panels excludes one group of persons otherwise eligible for jury service— those who do not choose to register to vote. These persons do not constitute a cognizable group." 251 Kan. at 162.

Similarly, here, the State has imposed no obstacles that prevent a discernible class of individuals from reporting for jury duty. The Sedgwick County District Court issued summons to all prospective jurors on the same date; the court enforced the summons in the same manner. The fact that a certain segment of the community honored the summons slightly better than another segment of the community does not establish a program of systematic discrimination, even if the segment of the community which fails to honor the summons is predominantly from one minority group.

The defendant contends the district court was statutorily required to compel jury service by issuing $100 fines upon individuals who inexcusably failed to report for jury duty. K.S.A. 43-165 provides, in part, "Unexcused, nonattendance of a person summoned unless reasonable cause for such nonattendance be shown to the satisfaction of the court shall be punished by the imposition of a fine not exceeding one hundred dollars ($100) for each day of unexcused absence."

While the district court jury clerk admitted that no summoned juror had ever been sanctioned for failing to appear for jury duty, the court's failure to comply with K.S.A. 43-165 does not establish a system of discrimination. The failure to impose sanctions upon jurors who fail to appear for service is applied equally to the entire community. The defendant argues that lower income individuals are more likely to fail to appear for jury duty without excuse than higher income individuals, yet the defendant provides no factual support for this assertion. Professor Sheffield testified that failure to compel jury service might have a disproportionate impact on lower income individuals who cannot accept the pay loss by attending the jury service, but Sheffield's opinion did not take into account the possibility that economic hardship might also provide reasonable cause for failing to appear.

According to the court's jury clerk, the number of summoned jurors who failed to report for service included those who were permanently and temporarily excused due to ineligibility or personal hardship. As a result, members of Tract 1 were potentially excused from jury service on the specified dates in November and December in greater proportion than the individuals in Tract 2. This undermines the defendant's claim that enforcement of jury service would lead to a more equal representation of Tract 1 in Sedgwick County jury pools.

The situation presented in this case is distinguishable from the situation presented in *Taylor v. Louisiana*, 419 U.S. 522. In *Taylor*, the United States Supreme Court struck down a Louisiana exemption which allowed women to choose whether to serve on a jury. The practical effect of allowing a specified class to choose whether to attend jury service was discrimination against that class with

respect to the jury composition. Here, the district court's failure to compel jury service does not target a specific class. There is insufficient evidence from which to conclude that failure to compel jury service has any disparate effect upon individuals from Tract 1 reporting for jury service. While compelling jury service might increase the percentage of summoned individuals who appear for jury service in Tract 1, it might additionally increase the percentage of summoned individuals who appear for jury service in Tract 2 proportionately or at a greater proportion.

In short, the defendant has totally failed to establish that Sedgwick County's failure to compel jury service through K.S.A. 43-165 constituted a system of discrimination which worked to cause disparity in the jury representation of a distinct segment of the community. The district court properly denied the motion to discharge the jury.

## *BATSON* CHALLENGE

The defendant next contends the district court erred in affirming the State's use of its peremptory challenge to remove one of three African-American jurors on the jury panel. Claims that a prosecutor has sought to exercise peremptory strikes in a discriminatory manner are governed by *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

A *Batson* challenge involves a three-step inquiry. First, the court must consider whether the defendant established a prima facie showing that the prosecutor exercised the peremptory strike on the basis of race. This consideration involves a question of law subject to unlimited review. *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006).

In determining whether a defendant has established a prima facie case of discrimination, a court should examine all of the relevant circumstances. It is insufficient evidence of discrimination merely to allege that one of the potential jurors struck from a jury was of a particular minority race. See *State v. Sledd*, 250 Kan. 15, 20, 825 P.2d 114, *cert. denied* 506 U.S. 849 (1992) (citing *Batson*). Here, the defendant's only argument in challenging the State's peremptory strike of one of three African-American jurors passed for

cause was that she was African-American and that she had not indicated that she would be unfair or partial.

The fact a juror has not demonstrated an incapacity to judge fairly or impartially merely protects them from being challenged for cause. If a *Batson* challenge could be established merely by demonstrating that a juror who was objectively fair and impartial had been challenged, the use of peremptory challenges would be meaningless, because any juror deemed unable to be fair and impartial could be challenged and removed for cause. Consequently, the district court properly held the defendant had failed to present a prima facie showing of racial discrimination in the exercise of the State's peremptory strikes.

Nevertheless, the district court took the additional precaution of requiring the State to provide a race-neutral reason for striking the juror. See *Sledd*, 250 Kan. at 21 (encouraging district courts to require State to provide race-neutral bases for strikes even when court has ruled defendant failed to prove discriminatory purpose behind strikes). This is the second step of the *Batson* analysis. See *Pham*, 281 Kan. at 1237.

When reviewing a prosecutor's explanation for a peremptory challenge, a court must not require a persuasive or plausible reason but must consider whether the reason is facially valid. If the explanation is not inherently discriminatory, the explanation will be presumed to be race neutral. *Pham*, 281 Kan. at 1237. Here, the prosecutor explained the challenged juror was a nursing student who was unemployed; therefore, the prosecutor did not know the source of the juror's livelihood. The prosecutor noted he had challenged the only other juror who indicated current lack of employment. The prosecutor additionally explained the challenged African-American juror visited the crime scene four times per week. After defense counsel attacked the prosecution's race-neutral reasons, the prosecution added an additional reason: the challenged juror's young age and lack of life experience.

During voir dire, the challenged African-American juror indicated she had never been married, she rented her residence, she was a full-time nursing student, and consequently was unemployed. She further admitted she regularly visited the crime scene four

times per week. One of the other jurors who admitted he frequently drove by the crime scene was nonetheless seated on the jury. However, the record supports the prosecutor's explanation he did not wish to have unemployed jurors on the jury panel and the challenged African-American juror was young.

In the final step of the *Batson* analysis, the court must determine whether the defendant has carried his or her burden of showing of purposeful discrimination in the exercise of a peremptory challenge. Because the district court's determination inherently involves weighing credibility, appellate review of this step of the *Batson* analysis is highly deferential to the district court. A district court's determination that a peremptory challenge was constitutionally permissible will be reversed only upon a showing of an abuse of discretion. Judicial discretion is abused only when no reasonable person would take the view adopted by the court. See *Pham*, 281 Kan. at 1236-37.

Here, the district court found the defendant had failed to establish purposeful discrimination in the State's exercise of its peremptory challenge against one of the three African-American jurors passed for cause. Based on the record on appeal, the district court's determination is reasonable and cannot be deemed an abuse of discretion.

## SENTENCING DEPARTURE

The final argument raised by the defendant in this appeal concerns the district court's denial of his motion for a downward durational sentencing departure. An appellate court possesses no jurisdiction to review a presumptive sentence imposed under the Kansas Sentencing Guidelines. K.S.A. 21-4721(c)(1). Even review of a claim that a sentence was induced by partiality, prejudice, oppression, or corrupt motive is limited to departure sentences. *State v. Flores*, 268 Kan. 657, 659, 999 P.2d 919 (2000).

Because the defendant's sentence fell within the presumptive sentencing guidelines range, this court lacks jurisdiction to consider the defendant's departure argument. "The right to appeal is entirely a statutory right; the Court of Appeals has only such appellate jurisdiction as is conferred by statute pursuant to the Kansas Con-

stitution, and when the record discloses a lack of jurisdiction, it is the duty of this court to dismiss the appeal." *City of Wichita v. Smith*, 31 Kan. App. 2d 837, 839, 75 P.3d 1228 (2003). Accordingly, this issue must be dismissed.

Affirmed in part and dismissed in part.